ILLINOIS CENTRAL RAILROAD COMPANY, Respondent,
v. EAST SIOUX FALLS QUARRY
COMPANY et al., Appellants.

(144 N. W. 724.)

1. **Eminent Domain—Power to Exercise—Conditions Precedent.**
     One seeking to exercise the delegated power of eminent domain must show that he is within the class to whom the power was delegated, that he has complied with all conditions precedent, that the purpose of the condemnation is one of the statutory purposes enumerated, that the property is taken for a public use, and that it is necessary thereto.
2. **Eminent Domain—Compliance With Conditions Precedent.**
     The power of eminent domain, being one possessed by a railway corporation solely by being delegated by sovereign power, its exercise depends upon a strict compliance with every condition precedent prescribed by such sovereign power.
3. **Eminent Domain—Conditions Precedent—Requirements as to Foreign Corporations.**
     Civ. Code, Sec. 494 provides that, before a foreign railroad

corporation shall. avail itself of the benefits of the act permitting such companies to build branch roads, it shall "comply with all other provisions of the laws of this state relating to foreign corporations." Sec. 551 requires every railroad corporation to maintain a place for transacting business, and to keep therein for public inspection books, etc., showing amount of its capital stock, etc.; which section was enacted pursuant to Const., Art. 17, Sec. 12, which, after reciting almost verbatim the provisions of that section, required the legislature to pass laws "enforcing by suitable penalties" the provisions of the section. Sec. 552, Civ. Code, provided a money penalty for non-compliance with Sec. 551. **Held,** that Sec. 494 only required foreign railroad companies to comply with those statutes imposing duties upon foreign, as distinguished from domestic, corporations, and hence, and also because of said provision imposing a penalty, it cannot be claimed that a foreign railroad corporation cannot exercise power of eminent domain for construction of lines because it has not complied with Sec. 551.

4. **Railroads—Construction—Designation of Proposed Route— "Branch Road."**

Civ. Code, Sec. 506, provides that, before making any extension or building any branch road, a railroad corporation shall, by resolution of its board of directors, designate the route of the branch according to Sec. 480, which requires articles of incorporation to recite the place from and to which a railroad is to be constructed and operated. **Held,** that an industrial spur or switch is not a "branch road" within Sec. 506, so as to require such resolution of directors to be passed and filed, as a condition precedent to the right to condemn land therefor; the term "branch road" denoting a road connected with main line, but not a mere incident thereto intended merely to facilitate the business of the main line, but designated to have a business of its own for transportation of persons and property to and from places not reached by main line.

5. **Eminent Domain—Purpose—Condemnation for Industrial Spur.**

Civ. Code, Sec. 505, authorizing railroad corporations to take and appropriate realty necessary for construction of its road, including "switches, side tracks," etc., authorizes condemnation of land for an industrial spur track.

6. **Same—Right of—Legislative Power to Grant.**

The power to clothe courts with power to deny to railroad companies the right to exercise the power of eminent domain because no "public necessity" exists for its exercise, or because its exercise would not tend to enable railroads to discharge "its public duties or effect the purposes of its organization," is vested in the legislature, except when it has delegated the same to some other tribunal, such as a railroad commission.

7    Same—Public Use—Judicial Question.
      The question whether land sought to be condemned is· to be
      taken for public use, is ultimately a judicial question.
8.   Same—"Public Use," What Constitutes.
      The controlling consideration in determining whether land
      is taken for a "public use" is not the necessity for the use,
      nor the fact of use, but the right to use.
9.   Same—Public Use—Industrial Switch—Individual Applicant.
      While the spur track in question is sought by one individual,
      who will, when it is first constructed, be the sole person, other
      than the railroad corporation to whose line it is a switch, will
      receive much, if any benefit from its construction, yet, as the
      spur may in the future be used by any other shipper who de-
      sires to use it under supervision of the railroad commission,
      held, it is taken for a public use.

(Opinion filed December 30, 1913.)

Appeal from circuit court, Minnehaha County. Hon. JOSEPH W. JONES, Judge.

Condemnation proceedings by the Illinois Central Railroad Company against the East Sioux Falls Quarry Company and another. From a judgment for plaintiff, and from an order denying a new trial, defendants appeal. Affirmed.

*Boyce, Warren & Fairbank,* for Appellants.

The Illinois Central Railroad Company does not possess the power to take private property for the purpose of building a branch to the road of its lessor because it has not complied with the statutory conditions precedent to the exercise of such power in such case. Civil Code Sec. 505, 506, 494, 551; Const. S. D. Sec. 12 of Art. 17; Crandall v. Des Moines 72 N. W. 778; 15 Cyc. 812, 815, 573; State v. Jersey City, 54 N. J. L. 49, 22 Atl. 1052; People v. New York 92 N. E. 18; Illinois State Trust Co. v. St. Louis Ry. Co. 70 N. E. 357; Evansville Traction Co. v. Henderson Bridge Co. 72 C. C. A. 539; Gilette v. Aurora Ry. Co. 81 N. E. 1005, 1010; McAuley v. Columbus etc. Ry. Co. 83 Ill. 348; Lewis Eminent Domain 254; Minn. Canal Co. v. Koochinching Co. 107 N. W. 405, 5 L. R. A. (N. S.) 638.

The respondent does not possess power to take the lands of the appellants for the branch road in question because its board of directors did not adopt a resolution designating the route of such proposed extension or branch and file a copy

thereof certified by the president and secretary in the office of the secretary of state. Civil Code Sec. 506; In re Eastern Railway Co. 116 N. W. 841; 33 Cyc. 117, 118, 120; AcAboy's Appeal 107 Pa. St. 548; Biles v. Tacoma etc. Railroad Co. 32 Pac. 211; Memphis v. St. Louis etc. Railway Co. 106 C. C. A. 75; Crandall v. Des Moines 72 N. W. 778; Chicago & Eastern Ry. Co. v. Wiltse 6 N. E. 49; 15 Cyc. 812-815, 572; State v. Jersey City, 54 N. J. L. 49, 22 Atl. 1052; 2 Elliott on Railroads, Sec. 461; Western Union Tel. Co. v. Penn. Ry. Co. 195 U. S. 594, 49 L. Ed. 332.

The statute does not empower a railroad company to condemn lands for a spur or industrial track from the main line to a private establishment. Such is not one of the purposes enumerated in the statute for which lands may be taken by railroad companies. Civil Code S. D. Section 505; Sec. 488 Civil Code, Subd. 3; Elliott on Railroads, Sec. 954-961, 923; Lewis Em. Dom. Sec. 256; Renssalaer & S. Ry. Co. v. Davis 43 N. Y. 144; Minneapolis & C. Ry. Co. v. Nicolin 79 N. W. 304; Kinney v. Water & Light Co. 90 N. E. 129; Chicago & N. W. Ry. Co. v. Gaet 23 N. E. 427; People v. Northern Central Ry. Co. 58 N. E. 138.

The evidence shows that these lands are to be taken for the private use of the respondent and W. V. Lowe and not for any public use or purpose and that there is no public necessity for taking the same. Civil Code Secs. 494, 505, 506, 534, 532; Political Code Sec. 434, 435, 476; 3 Elliott on Railroads, Sec. 960; Chicago etc. Ry. Co. v. Wiltse 6 N. E. 49; Kyle v. Texas & N. O. Ry. Co. 4 L. R. A. 275; Pittsburg etc. Ry. Co. v. Benwood 2 L. R. A. 680; Rensselaer etc. Ry. Co. v. Davis 43 N. Y. 137; Weidenfield v. Sugar Run Co. 48 Fed. 615; Pere Marquette Ry. Co. v. U. S. Gypsum Co. 117 N. W. 733, 22 L. R. A. (N. S.) 181; Ulmer v. Lime Rock Ry. Co. 66 L. R. A. 387; St. Louis etc. Ry. Co. v. Petty 20 L. R. A. 434.

This sovereign power of the state to take private property for public use is to be exercised only by the state directly or by those to whom the legislature has delegated the power in certain enumerated instances, expressed either in the constitution or a legislative act. It devolves upon the party seeking to exercise the power to show upon the face of the proceedings: 1. That such

party is within the class to whom the power has been delegated. 2. That all conditions precedent have been complied with. 3. That the purpose for which the property is to be taken is one of the purposes enumerated in the statute. 4. That the property is to be taken for a public use. 5. That the particular property sought to be taken is necessary to the accomplishment of the public purpose intended.

Sec. 505, 494, 551 Rev. Civ. Code, Sec. 551 Civil Code, Sec. 12 Art. 17, State Constitution. State v. Jersey City, 54 N. J. L. 49; 22 Atl. 1052. Crandall v. Des Moines, 72 N. W. 778. Eminent Domain, 15 Cyc. 812, 815. A foreign corporation has no right to exercise such power unless expressly granted and then only upon compliance with the terms of the grant, and in case it does not violate the provisions of the state Constitution 15 Cyc. 573. Chestatee Pyrites Co. v. Mining Co. 100 Am. St. Rep. 174. Ill. State Trust Co. v. St. Louis Ry. Co. 70 N. E. 357. Evansville Trac. Co. v. Henderson Bridge Co. 72 C. C. A. 539. Foltz v. St. Louis etc. Ry. Co. 8 C. C. A. 635.

The statutory grant of power is to be strictly construed and any doubt as to the existence of the power is to be resolved in favor of the land owner. To doubt is to deny the power. 1 Lewis Em. Dom. 254. Minn. Canal etc. Co. v. Koochinching Co. 107 N. W. 405; 5 L. R. A. N. S. 638.

The statutes of this state do not confer the power of eminent domain upon *any and all* corporations engaged in the railroad business or upon corporations generally, but only upon such foreign corporations as are *expressly authorized to construct, maintain or operate* a railroad within this State *upon compliance with the laws and constitution of the State*.

Section 2, Chapter 124, Laws 1899. Before any foreign railroad corporation can extend its line into this state or build branches it shall by a resolution of its directors designate the route of such proposed extension or branch and file a copy of such record certified by the president and secretary in the office of the Secretary of State as required by Section 506 of the Civil Code. The proposed spur or industrial track in question is a branch railroad within the meaning of this section, compliance with which was essential to authorize the company to take the land in question by condemnation proceedings. In re Estern Railway Company,

116 N. W. 841. Minneapolis & St. Louis Railroad Company v. Olson, 83 N. W. 1086. 33 Cyc. 117, 118, 120. McAboy's appeal, 107 Pa. St. 548. Biles v. Tacoma etc. Railroad Co., 32 Pac. 211. Memphis v. St. Louis Etc. Railway Co., 106, C. C. A. 75. Crandall v. Des Moines, 72 N. W. 778. Chicago & Eastern Ill. Ry. Co. v. Wiltse, 6 N. E. 49.

An elevated track running from the original terminus of the railroad in a city along a wharf is a branch road. McAboy's appeal. 107 Pa. St. 548. Memphis vs. St. Louis etc. Ry. Co., 106 C. C. A. 75.

The Statutes of this state do not delegate to railroad companies the power to condemn lands for a spur, or industrial track to a private establishment. Such power is not included in the enumerated purposes for which lands may be taken. Sec. 488 Civ. Code, Sub. 3. Sec. 505, Civil Code. Elliott on Railroads, Sec. 954-961, 923. Lewis Em. Dom. Sec. 256. Rensselaer & S. Rr. Co. vs. Davies, 43 N. Y. 144. Minneapolis & C. Ry. Co. v. Nicolin, 79 N. W. 304. Kinney v. Water & Light Co., 90 N. E. 129. Chicago & N. W. Ry. Co. v. Gaet, 23 N. E. 427. People v. Northern Central Ry. Co., 58 N. E. 138. Ligar v. Chicago, 28 N. E. 934.

Section 532, 434 Political Code. Under these statutes the public authorities would have no power to compel the railroad company to handle freight over this branch track and the public would have no right to enforce the use of this track. Chicago etc. Ry. Co. v. Wiltse, 6 N. E. 49 (Ill.)

The evidence does not establish either a public use or a public necessity for the taking of the lands in question; but on the contrary establishes the fact that the intended use is wholly private and that no public necessity exists requiring the taking of these lands to enable the railway company to discharge its public duties, or effect the purposes of its incorporation. Both are judicial questions in this state. 3 Elliott on Railroads, Sec. 960. Chicago etc. Ry. Co. v. Wiltse, 6 N. E. 49 Kyle v. Texas & N. O. R. Co., 4 L. R. A. 275. Pittsburg etc. Ry. Co. v. Denwood, 2 L. R. A. 680. Rensselear etc. Ry. Co. v. Davis, 43 N. Y. 137. Weidenfield v. Sugar Run Co., 48 Fed. 615. Pere Marquette Ry. Co. v. U. S. Gypsum Co. 22 L. R. A. N. S. 181, 117 N. W. 733.

Ulmer v. Lime Rock Co., 66 L. R. A. 387. St. Louis etc. Ry. Co. v. Petty, 20 L. R. A. 434.

*Bailey & Voorhees,* and *Helsell & Helsell,* for Respondents.

The Illinois Central Railway Company possesses power to condemn private property, and no resolution of its board of directors was necessary precedent to the construction of the track in question.

In 1887 a railroad was constructed by the Cherokee and Dakota Railroad Company from Cherokee, Iowa, to Sioux Falls, South Dakota.

On October 29, 1888, the Cherokee and Dakota Railroad Company sold and conveyed its line of railroad from Cherokee, Iowa to Sioux Falls, South Dakota, to the Dubuque and Sioux City Railroad Company. The latter company, on July 30, 1890, complied with the foreign corporation statute of South Dakota by appointing a resident agent and by filing a copy of its articles of incorporation in the office of the Secretary of State of South Dakota, and on January 21, 1895, leased portions of its line of railroad, including the line from Cherokee, Iowa, to Sioux Falls, South Dakota, acquired from the Cherokee and Dakota Railroad Company, to the Illinois Central Railroad Company. On July 1, 1904, a second lease of the railroad from Cherokee to Sioux Falls was made by the Dubuque and Sioux City Railroad Company to the Illinois Central Railroad Company. This latter lease contained a clause saving "rights arising and vested" under the lease of January 21, 1895.

On June 17, 1891, the Illinois Central Railroad Company complied with the foreign corporation statute of South Dakota by appointing a resident agent for the service of process and by filing a certified copy of its articles of incorporation with the Secretary of State. Since the 21st day of January, 1895, the Illinois Central Railroad Company has been in possession of the railroad in question and has operated the same. The case is, therefore, one of a condemnation proceeding brought by Respondent, the Illinois Central Railroad Company, as lessee. Chapter 124, Laws 1899, Section 2,. Sec. 495 Civ. Code.

Respondent, the Illinois Central Railroad Company, possesses the right to institute condemnation proceedings, for it title, as

lessee to the railroad originally built by the Cherokee & Dakota Railroad Company. Sections 480, 492, 506 Civil Code.

It is immaterial whether the Cherokee & Dakota Railroad Company complied with the provisions of Section 506 before it constructed its railroad into the territory of Dakota, for the reason that the road, as constructed, was legalized by Chapter 124, Laws of 1899.

The "branch" roads referred to in Section 492 do not refer to "side" or "spur" tracks, which are merely incidental, or appertaining to the main railroad and do not, in any proper sense, constitute "branch" roads. Sec. 505 Civil Code. Sec. 20, the Act of Congress to regulate commerce. Such resolution is only required, by Section 506, Civ. Code, of foreign railroad corporations desiring to extend their lines into this state, and by Section 492, Civ. Code, of corporations already having lines of railroad within the state and desiring to build "extensions" or "branch lines."

The filing of a copy of the articles of incorporation and appointing of a resident agent is all that the respondent was required to do to comply with Section 494, Civil Code. Both Section 12, Article 17, of the constitution and Chapter 62 Laws of 1890, have been a dead letter ever since the adoption of the constitution and the enactment of the statute. Their constitutionality is exceedingly doubtful, under the provisions of the federal constitution. The statute permits the condemnation of land for industrial trade.

The law is laid down in 15 Cyc. p. 590, (*tit. Eminent Domain*) as follows:

"A branch or lateral road, spur, or switch track, necessary to the proper operation of the main line of a railroad, or which may be necessary to connect important industries, or even a single industry with the main line or other public highway, provided however, that the general public has a right to use it, although it may also subserve private interests, is a public use for which private property may be taken under the power of eminent domain." St. Louis, etc., R. Co. v. Petty, 57 Ark. 359; Morrison v. Thistle Coal Co., 94 N. W. 507; Farnsworth v. Lime Rock R. Co., 83 Me. 440; New Cent. Coal Co. v. George's Creek Coal, etc., Co. 37 Md. 537; Toledo, etc., R. v. East Saginaw, etc., R. Co., 72 Mich, 206; Chicago, etc., R. Co. v. Porter, 43 Minn.,

527; Kettle River R. Co. v. Eastern R. Co., 41 Minn. 461; Kansas, etc., Coal R. Co. v. Northwestern Coal, etc., Co., 161 Mo. 288; Dietrich v. Murdock, 42 Mo. 279; Butte, etc., R. Co. v. Montana Union R. Co., 16 Mont. 504; DeCamp v. Hiberian Underground R. Co., 47 N. J. L. 43; Clarke v. Blackmar, 47 N. Y. 150; State v. Toledo R., etc., Co., 24 Ohio Cir. Ct. 321; Rudolph v. Pennsylvania Schuylkill Valley R. Co., 166 Pa. St. 430; Waddell's Appeal, 84 Pa. St. 90; Brown v. Corey, 43 Pa. St. 495; Boyd v. Negley, 40 Pa. St. 377; Hays v. Risher, 32 Pa. St. 169; Shoenberger v. Mulhollan, 8 Pa. St. 134; Ex. p. Bacot, 36 S. C. 125; Zircle v. Southern R. Co., 102 Va. 17; Chicago, etc., R. Co. v. Morehouse, 112 Wis. 1.

WHITING, P. J.    Plaintiff, a foreign corporation, as lessee of the owner thereof, another foreign corporation, operates a line of railway extending into this state from the state of Iowa, and brought this action seeking to exercise the right of eminent domain, and thereby condemn a right of way for a spur or industrial track, this proposed spur track to branch from the main line of such railway, and to extend across the land of defendants; its objective point being a private stone quarry owned by one Lowe.    Trial was had; a judgment condemning such land entered; motion for new trial denied; and defendants appealed from such judgment and order denying a new trial.

[1]   Appellants declare, and we think correctly, that it devolves upon a party seeking, through delegated power, to exercise the right of eminent domain to show:   "(1) That such party is *within the class* to whom the power has been delegated.   (2) That all *conditions precedent* have been complied with.   (3) That the purpose for which the property is to be taken is one of the purposes *enumerated in the statute.*   (4) That the property is to be taken for a *public use.*   (5) That the particular property sought to be taken is *necessary* to the accomplishment of the public purpose intended."

Appellants contend: (1) That the respondent does not passess the power to take private property for the purpose of building a *branch* to the road of its lessor, because it has not complied with the statutory conditions precedent to the exercise of such power in such case.   (2) That respondent does not possess the power to take the land of appellants for the *branch* road in ques-

tion, because its board of directors did not adopt a resolution designating the route of such proposed extension or branch, and file a copy thereof in the office of the secretary of state; that it could not proceed under the resolution adopted by the grantor of its lessor because (a) that resolution was for the main line, and did not include the branch in question; (b) the lease of such road by respondent could not transfer to it any franchise acquired by the grantor of its lessor, authorizing it to take private property for railway purposes. (3) That the statutes of this state do not empower a railway company to condemn land for a spur or industrial track from a main line to a private establishment. (4) That the evidence in this case shows that it was sought to take appellants' land for the private use of respondent and Lowe, and not for any public use or purpose, and that there is no public necessity for taking the same.

[2]    Has respondent complied with the statutory conditions precedent to the exercise of the power of eminent domain in this case? The power of eminent domain being a power which is possessed by a railway corporation solely by being delegated to such corporation by the sovereign power of the state, its existence depends upon a strict compliance with each and every condition prescribed by such sovereign power. 1 Lewis, Eminent Domain (3d Ed.) X 388; 15 Cyc. 812, 815; Chestatee, etc., Co. v. Cavenders Creek Co., 119 Ga. 354, 46 S. E. 422, 100 Am. St. Rep. 174.

[3]    It is conceded by appellants that a lessee operating a railroad belongs to a class to whom is delegated the power of eminent domain; it is also conceded that respondent is authorized to exercise such power for various purposes, but appellants contend that this authority comes from section 494, C. C., which provides among other things, that, before a foreign railroad corporation shall be permitted to avail itself of the provisions of such act, it "shall file with the secretary of state a duly certified copy of its charter or articles of incorporation, *and comply with all other provisions of the laws of this state relating to foreign corporations,*" and appellants contend that respondent has not complied with the provisions of section 551, C. C., which provides: "Every railroad corporation organized or doing business in this state under the laws or authority thereof shall have and maintain

a public office or place within the state for the transaction of its business and where shall be kept for public inspection, books, in which shall be recorded the amount of capital stock subscribed and by whom, the names of the owners of its stock and the amount owned by them respectively, the amount of stock paid in and by whom, the transfer of stock, the amount of the assets and liabilities of the corporation, and the names and places of residence of its officers."

This section was enacted pursuant to and for the purpose of carrying into effect section 12, art. 17, Const., which, after reciting almost verbatim what was afterward enacted in said section 551, provides: "And the Legislature shall pass laws enforcing by suitable penalties the provisions of this section. It is conceded that respondent has never complied with the above provisions of the Constitution and of said section 551; but respondent contends, and we think correctly, that a compliance therewith is not prerequisite to its right to exercise the right of eminent domain. It will be noted that the Constitution provides that the Legislature should pass laws enforcing, *by suitable penalties,* the said provisions of the Constitution. In compliance therewith the Legislature, by section 552, C. C., specifically provided for a penalty in the nature of a financial forfeiture. This certainly precludes any presumption that any other penalty was to be visited upon a corporation for a failure to comply with such provisions. It will also be observed that these constitutional and statutory provisions relate to railroad corporations only, while the proviso in section 494 recited that the corporation should "comply with all other provisions of the laws of this state relating to *foreign corporations*"—not with all other laws relating to *railroad corporations.* It is clear to our minds that this law requires that the *foreign railroad corporation* shall comply with those provisions of the statute only which impose duties upon *foreign corporations* as distinguished from *domestic corporations,* such as laws requiring filing of articles of incorporation, appointing of resident agents for purpose of service of process, etc. No claim is made but that respondent has complied with all the laws relating to foreign corporations generally. It will be noted that neither the Constitution nor section 551, C. C., provides that the right on the part of a foreign corporation to exercise the power of emin-

ent domain depends in any manner upon a compliance with the provisions therein contained.

[4] Was it incumbent upon respondent to plead and prove that its board of directors had passed and filed with the Secretary of State a resolution designating the route of the proposed spur or industrial track? Section 506, C. C., authorizes the building of *extensions* and *branches,* but further provides: "Before making such extension or building any such branch road, such corporation shall, by resolution of its directors, to be entered in the record of its proceedings, designate the route of such proposed extension or branch in the manner provided in section 480, and file a copy of such record, certified by the president and secretary, in the office of the secretary of state, and cause the same to be recorded as provided in section 480." Said section 480, C. C., authorizes the incorporating of a company for the constructing, maintaining, and operating of a railroad, and provides for the making and adopting of articles of incorporation, which articles are to be filed with the Secretary of State, and shall recite, among other things: "The place from and to which such railroad is to be constructed, or maintained and operated, as the case may be." It seems clear to us that the term "branch road" as used in said section 506—especially when we read the same in connection with and in the light of section 480—does not include a spur or industrial track. Certainly a railroad corporation need not, in its articles of incorporation, set forth each and every spur, switch, or side track it contemplates constructing, but need only, in general terms, describe the line of railroad it contemplates constructing or maintaining. In the case of Akers v. United N. J. R. R. Co., 43 N. J. Law, 110, in speaking of the term "branch railroad," the court said: "The branch railroad here designated means more than these side tracks. It denotes a road, connected indeed with the main line, but not a mere incident of it, not constructed simply to facilitate the business of the chief railway, but designed to have a business of its own, for the transportation of persons or property to and from places not reached by the principal route." We think the above a clear and excellent definition of what is meant by a "branch railroad," and it is in full accord with the classification made by the Interstate Commerce Commission: "Branch lines are defined as lines serving one or more sta-

tions beyond the point of junction with the main line or another branch line, and to or from which stations regular tariff rates are in effect. Spur tracks are defined as lines constructed to reach or serve industries, such as mills, mines, smelters, factories, etc., over which regular scheduled passenger or freight train service is not performed, and for transportation over which only a switching charge, if any, is made." The proposed spur or industrial track would not constitute a "branch" road, and therefore does not come under the provisions of section 480 and 506, supra.

[5]    Do the statutes of this state authorize respondent to construct and maintain, as owner, this spur track connecting with and to be used as a part of the railroad line of which it is but a lessee? Appellants contend that such spur will constitute an independent line of railroad, that it is not—like a switch or side track—a mere incident to the main line, and, as such, authorized under section 505, C. C. Section 505 C. C., reads as follows: "Every railroad corporation incorporated under this act, and any railroad corporation authorized to construct, operate or maintain a railroad within this state, has power and is authorized * * * to take, hold and appropriate so much real estate as may be necessary for the location, construction and convenient use of its road, including all necessary grounds for buildings, * * * switches, side tracks, * * * all materials for the construction of such road and its appurtenances, and the right of way over adjacent land sufficient to enable such corporation to construct and repair its road and the right to conduct water to its water stations, and construct and maintain proper drains, and may obtain the right to such real estate by purchase or condemnation in the manner provided by law." The above section concededly gives authority to respondent to appropriate such real estate as may be necessary for "the location, construction and convenient use * * * of switches, side tracks. * * *" Appellants state: "It would establish a most dangerous precedent to hold that under the general terms of this section, which so plainly relates only to the main line and its incidental side tracks, a railway company may, at its mere will and pleasure condemn a right of way over lands of private parties through any city or town in the state from its main line to some distant objective point, such as a mill, mine, factory, or quarry for the accommodation of the owners of such establishment."

It might be inferred from appellants' words that they were of the opinion that a corporation could at its mere will and pleasure condemn property for the things specified in said section 505; certainly appellants did not intend their words to be so construed. Under section 505, a railroad corporation, otherwise authorized, has full authority, *for public use,* to condemn property for each and every purpose mentioned in section 505, and for no other purpose; but we understand appellants' contention to be that section 505 does not contain words broad enough, in their import, to include spur and industrial tracks, and that there never was, prior to the year 1913, any statute in this state under which land could be condemned for spur or industrial tracks. We are satisfied that it was the intention of the Legislature, when enacting said Sec. 505, to authorize the condemning of land for the construction of lines of railway including all things usual and necessary for their maintenance and operation, and that said section authorizes the taking of property for spur tracks, and the legislature has not seen fit to impose any condition precedent upon the construction of spur tracks such as are imposed under sections 480 and 506 in case of the contemplated construction of main and branch lines—such spur tracks being considered like a switch or si.le track, mere incidents of the established line, and to be put in whenever there is public use for same.

[6] Appellants finally contend that "the evidence does not establish either a public use or a public necessity for the taking of the lands in question, but, on the contrary, establishes the fact that the intended use is wholly private, and no public necessity exists requiring the taking of these lands to enable the railway company to discharge its public duties or effect the purposes of its incorporation." The law-makers of this state have never seen fit to clothe the courts with the power to deny to a railroad corporation the right to exercise the power of eminent domain, for the reason that "no public necessity exists" for the exercise of such power, or for the reason that the exercise of such right would not tend "to enable the railroad company to discharge its public duties or effect the purposes of its incorporation." This power is vested in the Legislature except when it has delegated the same to other body or tribunal. Notes, 88 Am. St. Rep. 932. But this is a power

that might very properly be, and is often, vested in boards of railroad commissioners.

[7] There is, however, one question that, in case of dispute, must be left to the courts for final determination: "Is the land to be taken for a *public use?*" As was said by the court in Hairston v. Danville, etc., R. Co., 208 U. S. 598, 28 Sup. Ct. 331, 52 L. Ed. 637, 13 Ann. Cas. 1008: "But when we come to inquire what are public uses for which the right of compulsory taking may be employed, and what are private uses for which the right is forbidden, we find no agreement, either in reasoning or conclusion. The one and only principle in which all courts seem to agree is that the nature of the uses, whether public or private, is ultimately a judicial question."

What is meant by the term "public use" as the same is used in connection with the power of eminent domain? Lewis, in the third edition of his work on Eminent Domain, after declaring that the question of public use is not affected by the agency employed (section 253), nor by the fact that the use or benefit is local or limited (section 254), nor by the necessity or lack of necessity for the condemnation (section 255), further says, in sections 256-258: "Many courts seem to treat the question of *What is a public use?* as though the question was For what purposes may *the power of eminent domain be properly exercised?* This is a serious error. * * * To give these words any effect they must be construed as limiting the power to which they relate, that is, as limiting the purposes for which private property may be appropriated. As the power is by its nature limited to such purposes as promote the general welfare, it is evident that the words 'public use,' if they are to be construed as a limitation, cannot be equivalent to the general welfare or public good. They must receive a more restricted definition. The different views which have been taken of the words 'public use' resolve themselves into two classes; one holding that there must be a use or right of use on the part of the public or some limited portion of it, the other holding that they are equivalent to public benefit, utility, or advantage. It is, of course, impossible to reconcile these different views, and the question is, which one is correct? * * * The use of a thing is strictly and properly the employment or application of the thing in some manner. The public use of anything

is the employment or application of the thing by the public. Public use means the same as use by the public, and this, it seems to us, is the construction the words should receive in the constitutional provision in question. The reasons which incline us to this view are, first, that it accords with the primary and more commonly understood meaning of the words; second, it accords with the general practice in regard to taking private property for public use in vogue when the phrase was first brought into use in the earlier Constitutions; third, it is the only view which gives the words any force as a limitation or renders them capable of any definite and practical application."

Thus, while the legislature may determine that railroads, irrigation systems, mills, schools, etc., are public benefactors and even public necessities, and that their establishment will promote the general welfare; while it may determine that the exercise of the power of eminent domain is a proper agency through which such benefits and necessities may be secured; while it may determine the conditions under which such agency may be employed—yet the fact that the Legislature has enacted legislation covering all these matters in no manner determines that any particular railroad, irrigation system, mill, or school if established, would in fact be one that would be established for "public use." A railroad through a densely populated district, if constructed for the use of its owners, and over which the state had no control, and to the use of which its people had no rights, would not be one constructed for public use; while a railroad built ahead of the settler crossing mile after mile of uninhabited country, would be constructed *for public use*, if the people had the right to go out upon this uninhabited tract and demand of right the uses and benefits to be derived from the railroad.

[8] Thus we find that the matter that is controlling with the courts is not the *necessity* of the use, not even the *fact* of use, but the *right* to use. In the footnote to the case of Kansas City, etc., R. Co. v. Louisiana Western R. Co., in 7 Ann. Cases, 835, it is said: "It is held in a majority of the jurisdictions that the mere fact that the primary purposes of such a spur is to accommodate a particular private business enterprise is by no means a controlling test. The character of the use, whether public or private, is determined by the extent of the right of the public to its use and

not by the extent to which that right is or may be exercised. If the spur track may be used by the public generally upon equal terms, not merely by permission but as a right, and if the track is subject to governmental control, under general laws, as are the main lines of a railroad, then the use is a public one, and it is not material that but few persons enjoy it, or that it also serves a private use"—and a large number of authorities are cited in support of the above.

In Butte, etc., R. Co. v. Montana Union R. Co., 16 Mont. 504, 41 Pac. 232, 31 L. R. A. 298, 50 Am. St. Rep. 508, the court said: "The character of a way, whether it is public or private, is determined by the extent of the right to use it, and not by the extent to which that right is exercised. If all the people have a right to use it, it is a public way, although the number who have occasion to exercise the right is very small. * * * All termini of tracks and switches are more or less beneficial to private parties; but the public character of the use of the tracks is never affected by this."

In Riley v. Louisville, etc., R. Co., 142 Ky. 67, 133 S. W. 971, 35 L. R. A. (N. S.) 636, Ann. Cas. 1912 D, 230 it is said: "It is therefore plain that the mere fact that one or more persons or establishments, on account of the location of their property, will derive exceptional advantages from the construction of the road does not furnish any argument in support of the proposition that the road is not for a public use. If it did no roads would be built. It is also well settled that the improvement need not be used by or necessary to the public generally, or any considerable number thereof. The constitutional requirement will be satisfied if all the public desiring to use it have the right to do so upon the same terms and conditions, although only a few may choose to avail themselves of the opportunity. As was said in Chesapeake Stone Co. v. Moreland, 126 Ky. 656, 104 S. W. 762, 16 L. R. A. (N. S.) 479, in which it was sought to condemn land to build a tramroad to a rock quarry: 'It seems entirely probable that only a few persons, aside from the individual at whose instance it was established, will have occasion to use this tramway; but this fact does not destroy its public use in the meaning of the constitution. It is not the number of people who use the property taken under the law of eminent domain that constitutes the use of it a

public one, nor does the fact that the benefits will be in a large measure local enter into the question. In short, according to the generally recognized rule, the length of the public way, the places between which it runs, or the number of people who use it, is not the essential inquiry. The controlling and decisive question is, Have the public the right to its use upon the same terms as the person at whose instance the way was established? If they have, it is a public use; if they have not; it is a private one. If the owner can exercise the same kind of dominion over it as he does over other property owned by him, if he can close it up, if he can prohibit all or any part of the public from its use, then it is clear that its establishment would be private, and not public, and the right of eminent domain could not be invoked in its creation.'"

The following from the opinion in Zircle v. Southern Ry. Co,. 102 Va. 17, 45 S. E. 802, 102 Am. St. Rep. 805, is peculiarly pertinent to the facts before us: "The authorities practically speak with one voice to the effect that, if the use to be subserved is a public use, the fact that the branch road inures to the advantage of a particular individual, or class of individuals, will not render the use any the less public. Indeed, it is a matter of common observation that the possibility of reaching industrial enterprises along the proposed route of a railway is a legitimate and important factor in determining the question of location. * * * The test whether a use is public or not may be determined by the fact that where the use is public a trust attaches to the subject condemned for the benefit of the public, of the enjoyment of which it cannot be deprived by the company without a reasonable excuse, and by the further fact that the state retains the power to regulate and control the franchises of the company, and to prescribe the amount of charges and tolls which it shall be lawful for the company to exact for the transportation of passengers and freight."

And in C. & N. W. Ry. Co. v. Morehouse, 112 Wis. 1, 87 N. W. 849, 56 L. R. A. 240, 88 Am. St. Rep. 918, the court said: "A brief reference to some of the leading authorities will amply show that the fact that a spur track may run to a single industry does not militate against the devotion of the property thereto being a public use thereof, so long as the purpose of maintaining the track is to serve all persons who may desire it, and all can demand, as a right, to be served, without discrimination."

[9] Weighed in the light of the above authorities, it seems clear to us that, while the spur track in question is sought by one individual, and he will undoubtedly, for the present at least, be the sole person, other than the railroad corporation, to receive much if any, benefit from the construction of such spur, such spur will be open to the use of any other shipper who may demand service upon the same; such spur and the service thereon will be subject to the supervision and control of the railroad commissioners of this state; no person can be denied an equal right, with Lowe, to the use of such spur. Therefore respondent seeks to condemn the right of way in question for a public use.

The judgment and order appealed from are affirmed.